## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| THOMAS J. DART, in his official capacity | ) | Jury Trial Demanded. |
| capacity as Cook County Sheriff, CARA | ) | |
| SMITH, in her official  capacity as | ) | |
| Executive Director of the Cook County Jail, | ) | |
| COMMANDER SHARON A. WALLS, | ) | |
| in her individual capacity, SERGEANT | ) | |
| DARMEA McCOY, in her individual | ) | |
| capacity, OFFICER MARA BRYANT, in | ) | |
| her individual capacity, SERGEANT | ) | |
| ANTHONY GOMEZ, JR., in his individual | ) | |
| capacity, LIEUTENANT CHRISTI | ) | |
| GUZMAN, in her individual capacity, | ) | |
| SUPERINTENDENT JANE DOE 4 in her | ) | |
| individual capacity, BRITANY WATSON, | ) | |
| a Cook County Jail Inmate, YVONNE | ) | |
| AYALA, a Cook County Jail Inmate, | ) | |
| UNKNOWN COOK COUNTY | ) | |
| CORRECTIONAL OFFICERS JOHN | ) | |
| DOE 1 AND JANE DOES 1-3, in their | ) | |
| individual capacities, and COOK | ) | |
| COUNTY, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Now Comes Plaintiff, Jane Doe, by and through her attorneys, Kathleen T. Zellner & Associates, P.C., and complaining of Defendants, Thomas J. Dart, Cara Smith, Sharon A. Walls, Darmea McCoy, Mara Bryant, Anthony Gomez, Jr., Christi Guzman, Superintendent Jane Doe 4, Britany Watson, Yvonne Ayala, Unknown

1

Cook County Correctional Officers John Doe 1 and Jane Does 1-3, and Cook County, states as follows:

## Introduction

1.     The undisputed facts about Cook County Jail "CCJ" are well-known and widely disseminated.  Over 250 lawsuits have been filed and settled against the jail for its appalling conditions.  For example, the jail has been overcrowded for years; non-violent detainees are routinely thrown in with the most violent offenders with reckless disregard for their health and safety; putrid drinking water; filthy cells streaked with feces and smelling of urine; and "double-celling" people in isolation for days, weeks and even months are the norm.

2.     The conditions pale in comparison to the criminal treatment by officers of the inmates.  Officers have brutally beaten inmates and encouraged the inmates to rape and beat each other in a Chicago version of Abu Ghraib.  Officers have violently attacked mentally ill inmates for their alleged "non-compliance" with officers' orders.  The culture of lawlessness has flourished at CCJ because there is no accountability for the violent, sadistic, and cruel actions of the CCJ officers. There is no effective training, oversight, or accountability for the CCJ staff.  The worst CCJ officer profiles like a common street thug, but is far worse because of their intoxication with the little bit of power they have over the inmates.

3.     Defendant Thomas Dart and his predecessors have been on notice for years of the inhumane conditions at CCJ.  The first class action related to CCJ conditions was filed as early as 1974 in *Duran v. Elrod,* 74 C 2949.  In 1980, the

*Duran* decree was still in effect when the United States Department of Justice ("DOJ") investigated conditions at CCJ and concluded that inmates housed at the jail were "regularly subjected to inappropriate and excessive uses of physical force." Based on these findings the DOJ filed suit in 2010, *United States v. Cook County Illinois et. al.,* 10 cv 2946 (N.D. Ill.), and the parties entered into a consent decree requiring that the defendants, including Defendant Dart, provide the CCJ inmates with reasonably safe living conditions and protect them from excessive force and abuse. The case is currently pending before the Honorable Judge Virginia Kendall, and, pursuant to her order, an independent monitor files reports with the Court twice a year, tracking the defendant's compliance with the terms of the decree.

4.     However, little has changed in the jail since the DOJ filed suit. The most recent monitor's report, filed in December, 2013, finds that the County is not in compliance with critical consent decree provisions related to protection from harm and excessive use of force.

5.     Every conceivable form of violence and every related constitutional violation has occurred at CCJ, and yet other than a few transparently disingenuous efforts to pay lip service to reform at perfectly timed political moments, those in power at the highest levels of Cook County government have failed to remedy the culture of violence and deliberate indifference that exists at CCJ. Defendant Dart has given short shrift to these claims, choosing instead to characterize these lawsuits as "fiction" and the plaintiffs as mere criminals (although not yet

convicted).  Those in power have chosen to "slay the messenger" of these tales of horror as being unworthy of belief.

6.     Now a plaintiff has emerged via this lawsuit who is able to articulate in vivid detail the full horror of being a non-violent minimum security inmate at CCJ.  Plaintiff was a 27-year-old female at the time she was housed at CCJ.  She was a former medical student, and later a graduate student at one of the best universities in the nation.  She was arrested on non-violent charges in Cook County and locked up at CCJ for 27 days.  The Cook County charges were dismissed on December 4, 2013.  Plaintiff was held at CCJ until December 15 for extradition on non-violent charges to another state.  After Plaintiff's extradition she received probation for these offenses.

7.     During the 27 days at CCJ Plaintiff experienced the full panoply of abuses that the well-established culture of sadism and violence at CCJ had to offer.  She was sexually assaulted by an inmate rumored to be HIV-positive.  She was pummeled in beatings until her nose was broken and a tooth knocked out.  She was ambushed in a bathroom by inmates that jumped her like a pack of jackals, cutting her thigh down to the subcutaneous tissue with razor blades.  Her hair was pulled out in clumps.

8.     All of this occurred with the full knowledge and complicity of the officers and their supervisors.  Plaintiff was informed that the CCJ personnel thought the brutal attacks on her were amusing and they routinely encouraged the

abuse and then turned a blind eye to Plaintiff's desperate need for intervention and medical attention.

9.     It was only when the administration heard from Plaintiff's two prominent sisters – a physician and a human rights lawyer – that the damage control began and Plaintiff was the recipient of token gestures of compassion.

10.    Giving new meaning to the phrase, "power tends to corrupt and absolute power corrupts absolutely," the defendants in prior CCJ cases considered their victims to be intellectually inferior, possibly impaired by mental disease, and too disreputable to make effective plaintiffs in civil rights actions.  Plaintiff, however, suffers from none of those afflictions.  Plaintiff's near photographic memory has resulted in an ability to identify her abusers, quote their exact words, and describe in minute detail their abusive actions towards her.  Plaintiff has led a life marked by intellectual and humanitarian achievements that sustained her through her darkest hours in CCJ.

11.    Plaintiff brings this lawsuit to hold Defendants liable for their egregious violations of her civil rights.

### Jurisdiction and Venue

12.    This is a civil rights action brought pursuant to 42 U.S.C. §1983 et seq.; the Judicial Code, 28 U.S.C. §§1331 and 1343(a); and the Constitution of the United States. This Court also has supplemental jurisdiction over the pendent state law claims as codified in 28 U.S.C. §1367(a).

13.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. §1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district.

14.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1), as Plaintiff is a citizen of the State of Minnesota, no Defendant is a citizen of Minnesota, and the amount in controversy is greater than $75,000.

## Parties

15.     Plaintiff Jane Doe ("Plaintiff") is a resident and citizen of the State of Minnesota.  At all times relevant herein Plaintiff was a detainee at the Cook County Jail ("CCJ") located in Chicago, Cook County, Illinois.

16.     Defendant Thomas J. Dart ("Defendant Dart") was at all times relevant herein the Cook County Sheriff, responsible by law for maintaining the custody, safety, and well being of individuals committed to the CCJ.  Defendant Dart is being sued in his official capacity.

17.     Defendant Cara Smith ("Defendant Smith"), the Executive Director of the Cook County Jail, was at all times relevant herein employed by the Cook County Sheriff's Office, and along with Defendant Dart is responsible for making policies regarding the custody, care, and safety at CCJ.  Defendant Smith is being sued in her official capacity.

18.     Defendant Commander Sharon A. Walls ("Defendant Walls") was at all times relevant herein employed by the Cook County Sheriff's Office.  Defendant Walls is being sued in her individual capacity.  On information and belief,

6

Defendant Walls was the supervisor of Defendants McCoy, Bryant, Guzman, Gomez, and Defendant Jane Does 1-4, knew of her subordinates' misconduct as described herein, and approved of the misconduct and the basis for it.

19.     Defendant Sergeant Darmea McCoy ("Defendant McCoy") was at all times relevant herein employed by the Cook County Sheriff's Department as a correctional officer in the CCJ. Defendant McCoy is being sued in her individual capacity.

20.     Defendant Officer Mara Bryant ("Defendant Bryant") was at all times relevant herein employed by the Cook County Sheriff's Department as a correctional officer in the CCJ. Defendant Bryant is being sued in her individual capacity.

21.     Defendant Lieutenant Christi Guzman ("Defendant Guzman") was at all times relevant herein employed by the Cook County Sheriff's Department as a correctional officer in the CCJ. Defendant Guzman is being sued in her individual capacity.

22.     Defendant Officer Anthony Gomez, Jr. ("Defendant Gomez") was at all times relevant herein employed by the Cook County Sheriff's Department as a correctional officer in the CCJ. Defendant Gomez is being sued in his individual capacity.

23.     Defendant Superintendent Jane Doe 4 ("Defendant Jane Doe 4") was at all times relevant herein employed by the Cook County Sheriff's Department as the superintendent of Division IV, the division within which Plaintiff was housed at

the CCJ. Defendant Jane Doe 4 is being sued in her individual capacity. On information and belief, Defendant Jane Doe 4 was the supervisor of Defendants McCoy, Bryant, Guzman, Gomez, and Defendant Jane Does 1-3, knew of her subordinates' misconduct as described herein, and approved of the misconduct and the basis for it.

24. Defendant Unknown Cook County Correctional Officers (herein after identified as "Defendant John Doe No. 1" and "Defendant Jane Does 1-3") were at all times relevant herein employed by the Cook County Sheriff's Department as correctional officers in the CCJ. All Defendant John/Jane Does are being sued in their individual capacities.

25. At all times relevant herein, Defendants Dart, Smith, Walls, McCoy, Bryant, Guzman, Gomez, Superintendent Jane Doe 4, John Doe 1, and Jane Does 1-3 were acting under color of state law and in the course and scope of their employment.

26. Defendant Britany Watson ("Defendant Watson") was at all times relevant herein a Cook County Jail inmate charged with first degree murder, unlawful vehicular invasion, and burglary (Case No. 13 CR 0162802).

27. Defendant Yvonne Ayala ("Defendant Ayala") was at all times relevant herein a CCJ inmate charged with unlawful restraint. (Case No. 2013-0816082).

28. At all times relevant herein, Defendant Cook County was an Illinois municipal corporation. Defendant Cook County is empowered and directed to pay any judgment for compensatory damages, including associated attorney's fees and

costs, for which any Cook County Sheriff's Department employee acting within the scope of his or her employment is found liable. Accordingly, Defendant Cook County is named as an indemnification party to Count XI of this Complaint.

## Allegations of Fact

29. On November 20th, 2013, while attending graduate school, Plaintiff was arrested in Cook County on a drug charge which was dismissed on December 4, 2013. Plaintiff was detained without bail because she had an arrest warrant out of state for unrelated drug charges. Plaintiff's charges were all non-violent. Plaintiff immediately signed an extradition waiver allowing thirty days for extradition, otherwise she would have been released from CCJ because no Cook County charges were pending.

30. Plaintiff was booked into the CCJ on November 21st, 2013 as a minimum-security inmate. However, CCJ did not have space in a minimum-security unit, so Plaintiff was initially placed in Q-2, which is a maximum-security unit. When Plaintiff went to retrieve her uniform, an intake officer said to her: "What are you in here for? Picking flowers? You look so innocent" and joked that Plaintiff probably was not "gonna do too well in here."

31. Plaintiff also had a medical assessment during intake in which the physician declared her "lower-bunk status" because of recent surgeries on her right ankle that rendered her unable to put pressure on it. However, when Plaintiff arrived at Q-2, there was not a lower-bunk available. Defendant Bryant told her

that she was not going to move anyone and that if Plaintiff was unable to climb to the top bunk, she would have to sleep on the floor.

32.     Plaintiff's cellmate at the time was an elderly woman who had recently had knee surgery so she too was unable to climb to the top bunk.  Plaintiff was not willing to sleep on the filthy floor, so she just ended up taking the top bunk.

33.     Inmates immediately began targeting Plaintiff for reasons related to her ethnicity and appearance.  A rumor circulated that Plaintiff was a "confidential informant."  Inmates began offering Plaintiff commissary in exchange for sexual favors, which Plaintiff obviously declined.  Defendant Watson approached Plaintiff on her second day because Plaintiff was crying, under the guise of wanting to "console" Plaintiff.  Defendant Watson informed Plaintiff that she was incarcerated for a homicide.

34.     Defendant Watson proceeded to ask Plaintiff questions related to her sexual orientation.  She asked Plaintiff if she had ever been with a female and Plaintiff told her no.  She asked if Plaintiff would ever experiment with a female, and Plaintiff said no, to which she replied, "How do you know you wouldn't like it if you've never tried it?"  Defendant Watson told Plaintiff that she could be "gay for the stay," and that Plaintiff could be her "commissary hoe," which Plaintiff declined. Defendant Watson then said that she was going to continue to "work on [Plaintiff]," and for the rest of the day kept making sexual advances towards Plaintiff.

35.     On the morning of November 23rd, Plaintiff told the day officer, Defendant Jane Doe 1, that Defendant Watson was sexually harassing her and

making her feel uncomfortable. Defendant Jane Doe 1 asked if Defendant Watson had touched her in any way, and Plaintiff told her no but that she was concerned that she would. Defendant Jane Doe 1 informed Plaintiff that because Defendant Watson had not touched Plaintiff that she could not take action or file an incident report. Both statements by Jane Doe 1 were false.

36. Plaintiff recalls Jane Doe 1 to be a Caucasian female with stocky, short reddish-blond hair in her late 30's to early 40's.

37. Later that morning, Plaintiff was sitting underneath the stairs waiting to take a shower when Defendant Watson and two other inmates came and sat near her and began eyeing her and laughing. Defendant Watson stuck her tongue out and wiggled it at Plaintiff and began blowing kisses at her. Plaintiff eventually went into the shower, and after a few minutes Defendant Watson and the two other inmates approached. Defendant Watson was the only one who came in to the shower, while the other two stood guard outside. Another inmate yelled, "Are you going into the shower with snow-bunny?" Defendant Watson laughed and said "I'm just going in to get some water." Defendant Watson began staring at Plaintiff and told her that she had a "pretty little body." Plaintiff tried to cover her private parts with her hands and asked Defendant Watson to please leave. Defendant Watson told Plaintiff that she wasn't leaving and that she was there to "teach [her] a few things."

38. Defendant Watson, who was 5 feet 7 inches tall and 160 pounds, proceeded to grab Plaintiff, who was 5 feet 5 inches tall and 120 pounds, by her

waist, and turn Plaintiff around so that her back was facing her. Defendant Watson started groping Plaintiff's breasts and touching Plaintiff inappropriately. Plaintiff began crying and begging her to stop, but Defendant Watson kept saying things like "it's alright" and "you're gonna like this." Defendant Watson persisted in touching Plaintiff and then squatted down and grabbed Plaintiff's thighs with her hands. Defendant Watson put her face between Plaintiff's thighs and penetrated Plaintiff with her finger. Plaintiff tried to push her away, but Defendant Watson became more aggressive. At that point Plaintiff started screaming loudly, and Defendant Watson jumped up and said, "What the fuck is wrong with you," and ran out of the shower.

39.    When Plaintiff exited the shower she was confronted by a group of Defendant Watson's friends who warned Plaintiff that she better not be a snitch because the outcome for snitches was not good.

40.    Following the sexual assault, Plaintiff went and sat under the stairs so that she could avoid the other inmates. Defendant Jane Doe 1 came in to do a walk-through, and confronted Plaintiff about sitting under the stairs. Plaintiff explained to Defendant Jane Doe 1 what had just happened in the shower. Defendant Jane Doe 1 said she would "take care of it."

41.    Defendant Jane Doe 1 did not separate Plaintiff from Defendant Watson. Instead, as Defendant Jane Doe 1 walked away, she pointed a finger towards Defendant Watson and jokingly told her, "You stay out of trouble," which

clearly notified Defendant Watson that Plaintiff had reported what had happened to Defendant Jane Doe 1.

42.     Plaintiff moved from underneath the stairs to an adjacent spot by the wall.  When Defendant Jane Doe 1 returned to her cubicle, Defendant Watson and three other inmates approached Plaintiff, and each one of them grabbed Plaintiff by a limb and carried her back underneath the stairs.  Defendant Watson and three other inmates began kicking Plaintiff repeatedly in the face, stomach, and shoulders.

43.     Other inmates started gathering around to watch the brutal beating. Defendant Jane Doe 1 noticed the gathering crowd on a surveillance camera.  As Defendant Jane Doe 1 approached, the inmates attacking Plaintiff dispersed.

44.     Following the attack, Plaintiff was in excruciating pain and her blood was everywhere.  Defendant Jane Doe 1 asked Plaintiff, in front of several other inmates, what happened and who had attacked her.  Plaintiff, not wanting to be publicly identified as a "snitch," asked if she could speak to Defendant Jane Doe 1 privately, but Defendant Jane Doe 1 refused.  Defendant Jane Doe 1 told Plaintiff that she was going to assume that Plaintiff was fine and expressed relief that she would not have to do any paperwork to document the beating.

45.     Defendant Jane Doe 1 refused to allow Plaintiff to go to the infirmary, despite Plaintiff's obvious need for medical attention.

46.     After a shift change, Defendant Bryant walked by Plaintiff's cell. Plaintiff's cellmate told Defendant Bryant that Plaintiff had been severely beaten.

Due to the pain Plaintiff was in, she asked Defendant Bryant if she could go to the infirmary. Defendant Bryant refused, and told Plaintiff that the infirmary was very busy and that they would not see her unless Plaintiff "was dying." Defendant Bryant also told Plaintiff to "put a Band-Aid on her face and stop whining" and informed Plaintiff she was in "jail, not a spa." Defendant Bryant then told Plaintiff that Defendant Jane Doe 1 had told her that Plaintiff was a "pain in the ass."

47. According to CCJ policy, an incident report must be filed after a physical altercation and a medical evaluation is mandatory. Defendant Bryant and Defendant Jane Doe 1 never filed an incident report and Plaintiff was never medically evaluated for the sexual assault or the initial beating. No disciplinary action was ever taken against Defendant Watson or her friends for assaulting Plaintiff.

48. Later that evening, Plaintiff attempted to climb up to the top bunk. However, as a result of her prior surgery and the beating she received earlier in the day, Plaintiff ended up falling on the floor, hitting the right side of her head and the leg that she had previously had surgery on.

49. Plaintiff began screaming and crying, and her cellmate began calling for the officer through the choke-hole. Defendant Bryant approached and told Plaintiff that she should have slept on the floor and that it was her fault that she had fallen from the top bunk onto the floor.

50. Defendant Bryant reprimanded Plaintiff for constantly complaining, and informed Plaintiff that she was not special and therefore not going to receive

14

any special treatment. Defendant Bryant told Plaintiff that if she kept complaining, Plaintiff would go to "the hole" (solitary confinement). Defendant Bryant then suggested that Plaintiff "breathe into a paper bag," and then left.

51. The following morning, Defendant Jane Doe 1, who had been informed of the sexual and physical assaults on Plaintiff by Defendant Watson and others, did not mention the incident, and acted as though it had never happened.

52. While Plaintiff was taking a shower, Defendant Watson and two other inmates approached. One of the inmates grabbed a towel from Plaintiff's hand and dropped it on the floor. The inmate slapped Plaintiff's buttocks and then the group left.

53. Plaintiff told Defendant Jane Doe 1 that she was sexually abused in the shower and that she wanted to move to a different unit. Defendant Jane Doe 1 rolled her eyes and told Plaintiff that if she wanted to switch units she had to write to the grievance officer.

54. Plaintiff then had a visit with her sister, who is an attorney (hereinafter "AB"). AB immediately took notice of Plaintiff's injuries and expressed disbelief that Plaintiff had not been evaluated by a doctor. Plaintiff told AB everything that happened regarding the abuse of her at the hands of the CCJ officers and inmates.

55. AB informed Plaintiff's other sister, a physician (hereinafter "CD"), of all of the details of the abuse inflicted on Plaintiff at CCJ. CD called the CCJ and asked to speak to a supervisor; she was connected to someone claiming her name

was "Officer Snow," but it was later revealed that Officer Snow's real name is Defendant McCoy. CD explained the situation to Defendant McCoy, who was very rude and dismissive towards her, but said that she would ultimately look into the situation.

56.     Later that evening, Defendant McCoy arrived in Plaintiff's tier and asked in a loud voice where Plaintiff was by name. Plaintiff identified herself and Defendant McCoy came over and asked her what was going on. Plaintiff asked to speak privately with Defendant McCoy, but Defendant McCoy refused. Plaintiff then explained to Defendant McCoy that she was not going to accuse anyone publicly and that Defendant McCoy should understand why. Defendant McCoy called Plaintiff a "smart-ass" and began repeatedly yelling, "Point them out!" When Plaintiff would not identify the perpetrators, Defendant McCoy accused her of lying. Many inmates gathered around and watched the confrontation.

57.     Defendant McCoy refused to inquire of any other officers who may have had knowledge of who attacked Plaintiff. On information and belief, Defendant McCoy never reviewed any of the video footage from the time of the assault to try learn the identity of Plaintiff's attackers.

58.     Plaintiff knew that as a result of Defendant McCoy asking her to identify her attackers in front of other inmates, she would be further targeted for physical beatings and possible sexual assaults. The combination of the stress, physical injuries, and her low blood pressure from her prescribed medication Clonidine caused Plaintiff to faint.

59.     Defendant McCoy told Plaintiff to "quit faking" and told her to get up. When Plaintiff was unable, Defendant McCoy yanked her up by the arm. Defendant Bryant, who witnessed the confrontation, began to make fun of Plaintiff by doing fainting impressions.

60.     Defendant McCoy escorted Plaintiff down the hall. Plaintiff was limping from her injuries, and Defendant McCoy stated, "Oh yeah, make it look good for the cameras."

61.     Defendant McCoy took Plaintiff to Defendant Gomez's office. Defendant McCoy told Defendant Gomez that one of Plaintiff's sisters was calling the jail and "raising hell" because Plaintiff was "making false accusations" of rape and assault. Defendant McCoy referred to Plaintiff as "one of those sue-happy inmates." Defendant McCoy asked, "Should we interview her on videotape?" and Defendant Gomez responded, "No" without an explanation.

62.     Defendant Gomez acknowledged the injuries on Plaintiff's face and asked Plaintiff to describe what happened to her. Plaintiff explained to Defendant Gomez all of the details of the assaults and the other abuse she had suffered. Plaintiff also explained to Defendant Gomez how Defendant McCoy had approached her on the pod and asked her to publicly identify the perpetrators of her assaults.

63.     Defendant Gomez said there was not anything that he could do "at this point," other than to offer Plaintiff protective custody. Defendant Gomez explained that Plaintiff would be in her cell for 23 hours each day and that it was akin to solitary confinement, except that it would be voluntary on her part.

64.     Defendant Gomez further elaborated that PC mostly consisted of "child-molesters and baby-killers" that were in fear of being targeted by inmates because of the nature of their charges.  Plaintiff told Defendant Gomez that she did not want to be in PC and she signed a document stating that she did not want to be in PC.  Plaintiff told Defendant Gomez that she wanted to be moved to a unit that wasn't composed of all violent offenders since she was simply being held for extradition to another state on non-violent charges.

65.     Defendant McCoy once again accused Plaintiff of fabricating the sexual assaults and physical beatings.  Defendant McCoy told Plaintiff that inmates don't get to pick their tiers and that "this is not the Hilton and if you don't like the accommodations then you shouldn't have made the reservation."

66.     Defendant Gomez opened Plaintiff's file on his computer and commented that she should not have been placed in maximum security.  When Defendant Gomez opened her file on the computer, he asked why there was no incident report regarding the physical and sexual assaults.  Defendant Gomez stated that because the incidents occurred the day before there should have already been an incident report on file.  Defendant Gomez directed Defendant McCoy to file an incident report of her conversation with Plaintiff that night but that was never done by Defendant McCoy or anyone else.

67.     Defendant Gomez stated that he would make arrangements for Plaintiff to be moved.  Defendant Gomez stated that even if there was no room in a lower security unit, he would move someone so that Plaintiff would be placed in

18

lower security. Defendant Gomez told Plaintiff to return to Q-2 and wait in her cell to be moved. Despite observing her injuries and being told about them, Defendant Gomez took no action to have medical treatment provided to Plaintiff. Despite Defendant McCoy being abusive to Plaintiff in front of Defendant Gomez, he did nothing to intervene and stop the abuse or address Plaintiff's other concerns.

68.   Plaintiff was to be moved to I-2, a medium-maximum security unit just down the hall from Q-2. The inmates in I-2 were not completely separated from the violent offenders in Q-2. Plaintiff continued to run into Defendant Watson and the other inmates who had attacked her.

69.   When Plaintiff returned to Q-2, she was told that she would not be allowed to go into her cell until 9:00 p.m. Plaintiff made soup for herself and went downstairs to avoid the other inmates. Defendant Watson and two of her friends came downstairs after Plaintiff. They began walking closely around Plaintiff trying to intimidate her. At one point, as Plaintiff was taking a sip, an inmate named Jackie kicked at Plaintiff's face, knocking the soup cup out of Plaintiff's hands and hitting her in the chin. The soup spilled all over Plaintiff's uniform; when Plaintiff asked for a new uniform, the officer refused to provide her a new uniform because she would get a uniform the next day. Fortunately, Plaintiff was not burned by the soup.

70.   At around 8:45 p.m., Defendant McCoy returned to escort Plaintiff to her new tier, I-2. Defendant McCoy stated that it was a medium-maximum security tier, so it wouldn't be as hostile and that there would probably be a lot of

19

"dopeheads like [Plaintiff]." Defendant McCoy also said that she did not want to hear anymore "bullshit" from either Plaintiff or her sister, AB.

71.     Defendant McCoy walked Plaintiff into I-2 and told her to go into the day room. Defendant McCoy, in a loud voice, told the large group of inmates present in the day room, "Ladies, I have a public service announcement." Defendant McCoy then pointed at Plaintiff and said, "Don't mess with this 'ratchet'(raggedy) girl right here unless ya'll want to get snitched on." Defendant McCoy's announcement made Plaintiff a vulnerable target all over again in her new pod.

72.     Once again, Plaintiff was denied a top bunk. Plaintiff's new cellmate was an elderly, mentally-impaired woman, and Plaintiff compassionately decided not to request the lower bunk.

73.     Rather than risk further injury, Plaintiff decided to sleep on the floor the next couple of nights. However, the cell was so cramped that part of Plaintiff's body was under the toilet. The second night, her cellmate woke up to urinate and ended up urinating on the floor and on Plaintiff.

74.     Because of Defendant McCoy's "public service announcement," the other inmates were immediately hostile to Plaintiff, making remarks about Plaintiff being a snitch and referring to her as "albino," "cracker," and "Yankee." An inmate walked by Plaintiff and poured ice down her shirt; another inmate pulled her pants down while she was using the phone.

75.     Defendant Jane Doe 2, a morning officer on I-2, watched while Plaintiff's pants were being pulled down and she joked that there was a "full moon tonight." Defendant Jane Doe 2 did nothing to intervene and stop the harassment.

76.     Plaintiff recalls Defendant Jane Doe 2 to be a middle-aged heavy-set Caucasian female.

77.     The severity of the abuse escalated. One morning, while Plaintiff was taking a shower, two inmates came in and threw ice at Plaintiff. Another day, while Plaintiff was taking a shower, inmates came in and stole all of her clothes and her towel and Plaintiff had to wait in the shower for about half an hour for someone to retrieve other clothing for her. In a conversation with an inmate named Kinesha, she told Plaintiff that it was not fair but that is how "snitches" are treated in jail. Kinesha's statements confirmed the damage done by Defendant McCoy's "public service announcement."

78.     Plaintiff was afraid to report these incidents to the officers because, based on her prior experiences, she knew the officers would tell the other inmates and make her the target of even more abuse. Rather than make a verbal complaint to any of the correctional officers on the tier, Plaintiff wrote to Defendant Walls. Plaintiff never received any response to her grievance. Defendant Walls later told Plaintiff the grievance was probably "somewhere" on her desk.

79.     Plaintiff began washing up in her room because she was terrified to go into the shower. Inmates noticed that Plaintiff was not taking showers anymore and told Defendant Jane Doe 2 that she "smelled bad." Defendant Jane Doe 2 made

21

it a point to come into the day-room and address this by publicly yelling at Plaintiff and embarrassing her by yelling that Plaintiff "smelled bad." Plaintiff's impression was that Defendant Jane Doe 2 was trying to impress and curry favor with the inmates by making these comments to Plaintiff. Defendant Jane Doe 2's comments to Plaintiff subjected her to further ridicule by other inmates.

80.    On the morning of November 26th, one of the two most serious physical assaults on the Plaintiff occurred. Three inmates approached Plaintiff and asked to talk to her for a minute about something important. They took Plaintiff underneath the stairs and circled her. One of the inmates, Defendant Ayala, pushed Plaintiff's head into the staircase, and then slapped Plaintiff across the face. Defendant Ayala pushed Plaintiff again and she fell down, and all three of her attackers began kicking Plaintiff over and over again. They ended up knocking out a chunk of Plaintiff's tooth, lacerating her chin, and breaking her nose.

81.    It was Plaintiff's impression that Defendant Watson had instigated this attack on Plaintiff because Defendant Watson had contact with Defendant Ayala and her friends in a GED class.

82.    All of the inmates ran downstairs to watch the altercation. On information and belief, Defendant Jane Doe 2 was not paying attention to the cameras and did not notice the crowd that was gathering. When the assault was over everyone dispersed and two inmates, Kinesha and Jamie, came to help Plaintiff. They brought Plaintiff toilet paper so that she could clean the blood. Plaintiff's nose, chin, lip, and the inside of her mouth were all bleeding. Plaintiff

was not able to sit up, so they folded up her blanket and put it under her head. They encouraged Plaintiff to tell the officer or ask to speak to a "white shirt."

83.     However, Plaintiff was too frightened and intimidated to tell any officer or "white shirt" about these events because of the previous assaults on her after she had reported abuse.  After Plaintiff was able to sit-up, she went and sat next to her cell.  Plaintiff picked up the piece of her tooth that was knocked out, wrapped it in toilet paper, and put it in her pocket.  The remaining part of the tooth was so loose that Plaintiff eventually pulled it out on her own.

84.     When Defendant Jane Doe 2 came to unlock Plaintiff's cell door, she did not acknowledge the fact that Plaintiff was bleeding profusely.  Instead, Defendant Jane Doe 2 yelled at Plaintiff for bringing her blanket into the dayroom and warned that if Plaintiff did that again, Defendant Jane Doe 2 would write her up.

85.     On November 26th, AB again visited Plaintiff and observed her injuries.  AB asked the visiting room officer if she could speak to someone in charge. He told her that she would have to make an appointment if she wanted to meet with any staff member.  This same officer had previously mentioned to AB that he thought it was great that the Plaintiff was getting in fights.  When AB asked "What if she dies?" he responded, "Well, you'll have a great lawsuit."

86.     That same day, AB called the jail to speak with a supervisor.  AB was connected to Defendant McCoy.  Defendant McCoy told AB that Plaintiff was fabricating the beatings for attention.  AB asked Defendant McCoy how she could

23

explain all of Plaintiff's physical injuries if Plaintiff were making up the attacks. Defendant McCoy had no response.

87.    Defendant McCoy stated that if Plaintiff was being targeted then she was probably doing something to attract attention.  Defendant McCoy represented to AB that she would send somebody to talk to Plaintiff later that day, but no one ever came to see Plaintiff as Defendant McCoy had represented.

88.    On the evening of November 26, while Plaintiff was eating dinner, she noticed a strange taste to her potatoes and felt a burning sensation in her mouth and throat.  When Plaintiff smelled her tray, she realized that someone had put Nair in her food.  Plaintiff looked around and saw Defendant Ayala and her friends laughing and waving at her.  Plaintiff reported the incident to Defendant Jane Doe 3, who was indifferent about the incident.  Defendant Jane Doe 3 did not file an incident report so that the perpetrators could be disciplined.

89.    Plaintiff recalls that Defendant Jane Doe 3 was a soft-spoken Hispanic female with a tattoo on her arm that said "Antony" or "Anthony."

90.    On November 27th, Defendant Jane Doe 1, who was aware of the prior assaults and did nothing when she was working on Q-2, was on duty on I-2.  In the early morning, Plaintiff went into the bathroom to brush her teeth, and Defendant Ayala was present.  When Plaintiff walked in, Defendant Ayala began cursing at her and yelling at her to get out.  Plaintiff exited the bathroom.  After Defendant Ayala left the bathroom, Plaintiff re-entered the bathroom and began brushing her teeth.  Defendant Ayala returned to the bathroom with two of her friends, and they

cornered Plaintiff into a stall. One of the inmates stood guard in front of the stall and Defendant Ayala and the other girl began hitting Plaintiff. The inmate pulled Plaintiff's hair so that her head was tilted sideways, and Defendant Ayala pulled down Plaintiff's pants. Defendant Ayala then pulled out a razor blade and incised Plaintiff's left leg. Defendant Ayala then slashed Plaintiff's left eyebrow. Defendant Ayala dropped the razor blade and continued to hit Plaintiff. The other inmate pulled a patch of hair from Plaintiff's left temple

91. Plaintiff blacked out during part of the attack. When Plaintiff regained consciousness, she was lying on the middle of the bathroom floor in her underwear and looking up at Defendant Jane Doe 1. Defendant Jane Doe 1 was standing there watching, unfazed and eating M&Ms.

92. Defendant Jane Doe 1 asked Plaintiff to tell her what had just happened. Plaintiff told Defendant Jane Doe 1 that Defendant Ayala struck her with a razor blade. Despite the obvious wounds on Plaintiff's body, Defendant Jane Doe 1 told Plaintiff "that's not possible since inmates aren't allowed to have razors." Defendant Jane Doe 1 told Plaintiff that she would talk to Defendant Ayala and the other perpetrators and then file a report, which was never done.

93. Plaintiff observed that Defendant Jane Does 1 and 2 had a very cordial relationship and appeared to be very friendly with Defendant Ayala.

94. Defendant Jane Doe 1 continued by telling Plaintiff that "it's not a good idea to talk back to [Defendant Ayala]" and that she wasn't surprised that Plaintiff was getting her "ass kicked." Defendant Jane Doe 1 also stated that rather

than trying to change Plaintiff's surroundings, she should try to change herself because she thought she was "better than everyone" and "people noticed it."

95.     Plaintiff had tried everything possible to make herself inconspicuous to other inmates.  She hardly talked to anyone, tried to stay out of everyone's way, and never mentioned her background, her family, or their occupations.

96.     In the meantime, Plaintiff went back into her cell so that she could lie down.  Plaintiff put a towel around her thigh to try and stop the bleeding.  At no time during that day or night was any medical care provided to Plaintiff.  The razor had cut through all 3 levels of skin down to the subcutaneous level on Plaintiff's thigh.

97.     Later, Plaintiff came out of her cell to get her morning medicine from the nurse.  The medicine consisted of Clonidine, a blood pressure medication.  The nurse expressed concern about the fresh injuries on Plaintiff's face because she was aware of Plaintiff's prior injuries.  Specifically, the nurse said "Oh my God your face, you're bleeding again."  Plaintiff informed the nurse that she also had a large cut on her leg, and the nurse saw that Plaintiff was bleeding through her pants.  The nurse provided Plaintiff with alcohol squares, antibiotic ointment, Ibuprofen, and other medical supplies.  The nurse told Plaintiff that she would request for medical to see her.  Defendant Jane Doe 1 stood by observing this interaction and said nothing.  Defendant Jane Doe 1 did nothing to help Plaintiff receive medical treatment for her injuries.

26

98. CD visited Plaintiff later on November 27. CD, as a physician, was shocked at Plaintiff's condition. Plaintiff had a severely damaged nose which was bruised and had residual blood on her nostrils. Plaintiff would later learn that the serious injuries to her nose would require extensive plastic surgery to repair. Plaintiff also presented with bruising under both eyes, most prominently under her right eye, and a gaping wound under her chin. CD commented that the depth of the cut required stitches. Plaintiff told CD how an inmate cut her with a razor blade, and CD told Plaintiff that she needed to get tested for Hepatitis C and HIV since Plaintiff was cut with someone else's razor.

99. After CD's visit with Plaintiff she called the jail to speak to a supervisor. She spoke to an individual who identified himself as "Allen" ("Defendant John Doe 1"). Defendant John Doe 1 refused to disclose his rank or position to CD, telling her it was "irrelevant."

100. CD explained to Allen the emergent nature of Plaintiff's physical condition. CD explained that she was a physician and saw the need for immediate medical care before Plaintiff's injuries became worse or infected. CD also discussed her concerns regarding Defendant McCoy's handling of the situation and how she made Plaintiff a target with her "public service announcement."

101. Defendant John Doe 1 responded by stating that Defendant McCoy followed protocol, and he didn't see how her telling inmates Plaintiff was a snitch made her a target. Defendant John Doe 1 told CD that Plaintiff was in jail and should not expect to be treated with dignity and respect. Plaintiff's sister

threatened to hire a lawyer. Defendant John Doe 1 told her to go ahead, but ultimately it would be CCJ employees' word against Plaintiff's. Eventually Defendant John Doe 1 agreed to look into it, and told CD he would call her after doing so.

102. CD never heard back from Defendant John Doe 1. CD also emailed the Cook County Sheriff's Department on November 28, 2013 and detailed the severe abuse of Plaintiff.

103. In retaliation for Plaintiff's sister's statement to Defendant John Doe 1, later that night at about 9:30 p.m., an Officer Thomas came to the pod to speak with Plaintiff. When Officer Thomas saw Plaintiff she shook her head and she made a comment about how Plaintiff looked like she had been through hell. Officer Thomas began asking Plaintiff questions related to having any suicidal ideations, which Plaintiff denied. At no time did Officer Thomas represent to Plaintiff that she had the necessary credentials to be performing a psychological or psychiatric assessment of Plaintiff's mental state. Officer Thomas did not make any notes and these questions seemed to be a pretext to put Plaintiff in solitary confinement.

104. About thirty minutes after Officer Thomas left, two female African-American officers came and told Plaintiff to pack up her stuff, and leave behind any food/commissary items that Plaintiff had because Plaintiff was going to the "hole" (solitary confinement). Plaintiff began to protest and they said that if she did not comply, that they would drag Plaintiff out and have someone else pack up her things.

105.    Plaintiff began packing and when she grabbed her sheet and blanket, the remnants of her tooth fell out onto the floor from under her sheet. The officers confiscated the tooth and declared it as contraband. They handcuffed Plaintiff and escorted her to the "hole," where she later learned that she was being accused of "disrupting jail equipoise." The accusation was later amended to include "possessing dangerous contraband" i.e., Plaintiff's tooth.

106.    Plaintiff's telephone privileges were revoked as well, even though inmates in "the hole" are supposed to be allowed to use the phone during their one-hour period of recreation.

107.    Plaintiff was allowed out of her cell for one hour each day to take a shower or watch TV. Plaintiff's family became concerned because she had not contacted them as she usually had multiple times every day.

108.    Plaintiff's sisters contacted the jail and were connected to numerous people until it was misrepresented to them that Plaintiff had voluntarily entered herself into protective custody. Revealing that Plaintiff was in protective custody was against jail protocol. The jail was unable to produce documentation verifying that Plaintiff had voluntarily put herself into protective custody.

109.    On December 2nd, on her fifth day of solitary confinement, a Caucasian officer told Plaintiff to pack her things because she was moving to a new pod, J-2. Plaintiff was given no explanation for the move.

110.    Shortly after Plaintiff arrived at her new pod, she was brought to Defendant Guzman's office. Defendant Guzman told Plaintiff that she was

29

contacted by the Sheriff's Office due to concerns about how Plaintiff was being treated. Defendant Guzman stated that she was "appalled" that this had all gone on under her nose, and also that Plaintiff never received any medical attention.

111. Plaintiff had previously walked past Defendant Guzman in the hallway when her face was clearly injured. Defendant Guzman had looked directly at Plaintiff and said nothing.

112. Defendant Guzman told Plaintiff that she wanted to speak to Plaintiff in detail about everything, but first she wanted Plaintiff to be seen in the infirmary and by mental health as soon as possible.

113. A female officer ("Officer X") came to escort Plaintiff to the medical unit. Plaintiff knows the identity of Officer X, but will not disclose her name until the appropriate time because she fears reprisal against this officer. Officer X obtained a wheelchair for Plaintiff because she was limping.

114. Officer X told Plaintiff that she had actually heard about Plaintiff from other officers and that Plaintiff was disliked because the officers thought that Plaintiff believed she was privileged. According to Officer X, the other officers thought that the frequent assaults upon Plaintiff were amusing. Officer X told Plaintiff that other officers had told stories about her multiple times. Per Officer X, one of the officers apparently referred to Plaintiff as the "little rich white girl who was getting her ass beat." Officer X stated that as soon as the officers put on their uniforms they were on a power trip, and that the officers were jealous of Plaintiff.

115.   On December 2, 2013, a CCJ medical doctor put stitches in Plaintiff's chin and thigh, and gave her some prophylactic antibiotics because the wounds were deep and put her at risk for a staph infection.   He also took an x-ray of Plaintiff's nose and confirmed that it was broken.   He evaluated her ankle and determined that the pain and swelling was from the top-bunk fall.   He bandaged her ankle, prescribed pain medicine, and gave Plaintiff some ice packs.   He informed Plaintiff that they rarely administer narcotic pain medications in jail, but Plaintiff's injuries were severe enough to warrant it.   The doctor prescribed her Tylenol with codeine.

116.   The CCJ medical doctor gave Plaintiff the option of having a female practitioner come in and do a rape evaluation, but told Plaintiff it likely would be inconclusive since the incident occurred a couple of weeks ago.   He wanted Plaintiff to return the next day for blood work to test for Hepatitis C and HIV.   He also informed Plaintiff that if the tests come back negative, that she should get re-tested in 6 months since sometimes these viruses "lay dormant."

117.   The CCJ medical doctor told Plaintiff that they would call down to her the next day for a CT scan and blood work. There was no follow-up by the CCJ medical doctor even though Plaintiff was in CCJ for 10 more days.

118.   After Plaintiff's medical and mental health evaluation, she was again escorted back to Defendant Guzman's office.   Plaintiff asked Defendant Guzman why she was placed in solitary confinement.   Defendant Guzman stated that she had no record of Plaintiff ever being in solitary confinement.   Defendant Guzman

31

said she would investigate why Plaintiff had been placed in solitary confinement, but Plaintiff never heard from Defendant Guzman again.

119.   The following day, a woman came to speak with Plaintiff as there was a report that she had been repeatedly sexually assaulted.  The woman mentioned her meeting with Plaintiff was related to the Prison Rape Elimination Act.  The woman told Plaintiff that she should have been separated from Defendant Watson and her associates after the first sexual assault.

120.   Around December 3rd, Lieutenant Giunta visited with Plaintiff. Lieutenant Giunta stated that he was with the Sheriff's office, and that the Sheriff asked that he speak to Plaintiff to gather more information.  Lieutenant Giunta represented to Plaintiff that their conversation was confidential.  Plaintiff related to him all of the details of the abuse she had suffered at CCJ.

121.   Lieutenant Giunta, after hearing Plaintiff's description of her abuse at CCJ, repeatedly stated, "he knows what he has to do."  Lieutenant Giunta told Plaintiff that if anybody bothered her again, to inform an officer that that she wanted to speak with him or Defendant Guzman.  Lieutenant Giunta told Plaintiff that if she spoke with Defendant Guzman, Plaintiff should tell Defendant Guzman that she wanted to speak with Lieutenant Giunta.  After this meeting, Plaintiff never heard from Lieutenant Giunta again.

122.   Around December 15th, Plaintiff was extradited to another state. Plaintiff's sister CD spoke to an officer at the out of state jail (ACJ) named Officer Y

who assured CD that the ACJ had a zero-tolerance policy for inmate abuse and that CD should not worry.

123.   Officer Y spoke to Plaintiff regarding the CCJ abuse and reassured Plaintiff that such violence and hazing were not tolerated at ACJ.  Officer Y made sure that Plaintiff was able to speak to a mental health counselor immediately regarding the CCJ abuse because he believed that the CCJ abuse was most likely very psychologically damaging to Plaintiff.

124.   Plaintiff was incarcerated in the ACJ for almost six months and was never abused psychologically or physically by the officers or inmates.  In sharp contrast to CCJ, the ACJ officers were respectful of Plaintiff and did not abuse her in any way.

125.   As a result of the severe physical and psychological injuries Plaintiff sustained at CCJ, she is receiving psychiatric care and ongoing medical treatment. Eventually Plaintiff will need surgeries for the injuries she has sustained.

## COUNT I – 42 U.S.C. § 1983

### 14th Amendment - Deliberate Indifference to Plaintiff's Safety

### (All Defendants with the exception of Defendants Watson and Ayala)

126.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

127.   In a manner more fully described above, Plaintiff was incarcerated under conditions posing a substantial risk of serious harm as evidenced by the numerous sexual and physical assaults she endured at the hands of other inmates.

128.   In a manner more fully described above, Defendants had a subjective knowledge of Plaintiff's risk of harm and personally disregarded that risk.

129.   The misconduct described in this Count was objectively unreasonable and was undertaken with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

130.   The misconduct described in this Count shocks the conscience.

131.   As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional distress, and mental anguish.

## COUNT II - 42 U.S.C. § 1983

### 14th Amendment - Deliberate Indifference to Serious Medical Need
### (All Defendants with the exception of Defendants Watson and Ayala)

132.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

133.   In a manner more fully described above, Defendants failed to provide Plaintiff with access to timely, proper medical care, although they had actual knowledge that Plaintiff would suffer great harm if timely medical services were not provided.

134.   The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

135.   The misconduct described in this Count shocks the conscience.

136.   As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

## COUNT III - 42 U.S.C. § 1983

## 14th Amendment - State-Created Danger

## (All Defendants with the exception of Defendants Watson and Ayala)

137.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

138.   In a manner more fully described above Defendants, by their affirmative acts, created or increased the danger faced by Plaintiff.

139.   In a manner more fully described above, Defendants failed to protect Plaintiff from the danger they created.

140.   The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

141.   The misconduct described in this Count shocks the conscience.

142.   As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

**COUNT IV - 42 U.S.C. § 1983**

**1st Amendment - Retaliation**

**(All Defendants with the exception of Defendants Watson and Ayala)**

143.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

144.   In a manner more fully described above, when Plaintiff lodged complaints about jail conditions, Defendants retaliated by pressuring her to falsely recant her accusations, labeling her a snitch to other inmates, subjecting her to physical beatings, denying her access to medical treatment, and placing her in solitary confinement.

145.   The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

146.   As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

**COUNT V - 42 U.S.C. § 1983**

**Failure to Intervene**

**(All Defendants with the exception of Defendants Watson and Ayala)**

147.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

148.    In a manner more fully described above, one or more Defendants stood by and watched without intervening to prevent the unconstitutional and illegal conduct to which Plaintiff was subjected.  These Defendants had a reasonable opportunity to prevent the harm, but failed to do so.

149.    The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

150.    As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

## COUNT VI - 42 U.S.C. § 1983

## Civil Conspiracy

## (All Defendants with the exception of Defendants Watson and Ayala)

151.    Each of the foregoing paragraphs is incorporated as if fully restated herein.

152.    In a manner more fully described above, Defendants together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of her constitutional rights as set forth herein, including but not limited to the deprivation of Plaintiff's right to physical safety and timely medical treatment.

153.    In furtherance of the conspiracy, each of the co-conspirators engaged in numerous overt acts, including but not limited to the failure to separate Plaintiff

from Defendant Watson after Defendant Watson started to sexually harass Plaintiff, failing to facilitate medical treatment of Plaintiff after she was sexually assaulted by Defendant Watson, failing to separate Plaintiff from other inmates, including Defendant Watson, who posed a risk to Plaintiff's physical safety after Plaintiff was sexually assaulted, identifying Plaintiff as a "snitch" in front of other inmates, failing to separate Plaintiff from other inmates who posed a danger to Plaintiff after the numerous beatings she endured, failing to facilitate medical treatment of Plaintiff after she was beaten, and failing to file incident reports regarding the assaults Plaintiff endured.

154.    The misconduct described in this Count was undertaken with malice, willfulness, and/or deliberate indifference to Plaintiff's constitutional rights.

155.    The conspiracy and overt acts described herein commenced at approximately the time Plaintiff was admitted to CCJ and continued to approximately the date of her extradition.

156.    As a direct and proximate result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

### COUNT VII - 42 U.S.C. § 1983

### *Monell* Claim

### (Defendants Dart and Smith)

157.    Each of the foregoing paragraphs is incorporated as if fully restated herein.

38

158.   In his capacity as the Sheriff of Cook County, Defendant Dart is a policymaker for CCJ, and as such is responsible for establishing and ensuring that protocols and procedures are followed to ensure the welfare and safety of pre-trial detainees, like Plaintiff.

159.   In her capacity as Executive Director of CCJ, Defendant Smith is a policymaker for CCJ, and as such is responsible for establishing and ensuring that protocols and procedures are followed to ensure the welfare and safety of pre-trial detainees, like Plaintiff.

160.   A culture of violence between inmates is accepted and tacitly ratified by Defendants Dart and Smith.  Similarly, a culture of indifference to the health and safety of pre-trial detainees, such as Plaintiff, is condoned by Defendants Dart and Smith.

161.   In or about 2013, and for a significant period of time prior thereto, there were in place at CCJ the following unconstitutional customs, policies, and/or practices:

   a. placing pre-trial detainees accused of non-violent offenses and no violent criminal history with pre-trial detainees accused of violent offenses with criminal histories indicative of violence;

   b. placing minimum security pre-trial detainees with maximum security pre-trial detainees;

   c. placing pre-trial detainees vulnerable to physical or sexual assault with pre-trial detainees likely to commit physical or sexual assaults;

   d. failing to investigate physical and/or sexual assaults perpetrated by one pre-trial detainee against another, thereby promoting further assaults;

e.  failing to file incident reports regarding physical and/or sexual assaults perpetrated by one pre-trial detainee against another, thereby promoting further assaults;

f.  failing to provide prompt medical care and treatment to inmates who have been subject to physical and/or sexual assaults perpetrated by other pre-trial detainees;

g.  failing to refer physical and/or sexual assaults perpetrated by one pre-trial detainee against another inmate to the Cook County State's Attorney's Office, thereby promoting further assaults;

h.  failing to separate inmates who physically and/or sexually assault other inmates from the general population, thereby promoting further assaults;

i.  failing to discipline inmates who physically and/or sexually assault other inmates, thereby promoting further assaults;

j.  failing to investigate CCJ correctional officers who allegedly act with deliberate indifference to a pre-trial detainee's constitutional rights; and,

k.  failing to discipline, reprimand, and/or terminate CCJ correctional officers who act with deliberate indifference to a pre-trial detainee's constitutional rights.

162.   Defendants Dart and Smith are liable to Plaintiff in their official capacity because they are responsible for the policies and procedures implemented at CCJ, which directly and proximately caused Plaintiff's personal injuries as described herein.

163.   As a direct and proximate result of the wrongful customs, policies, and/or practices in effect at CCJ as set forth herein, Plaintiff was deprived of the rights, privileges, and immunities secured to her by the 14th Amendment of the United States Constitution.

## COUNT VIII - ILLINOIS STATE LAW

## Intentional Infliction of Emotional Distress

## (All Defendants)

164.   Each of the foregoing paragraphs is incorporated as if fully restated herein.

165.   In a manner more fully described above, Defendants engaged in extreme and outrageous conduct.

166.   As to the CCJ Defendants, this extreme and outrageous conduct was rooted in an abuse of power and authority.

167.   This extreme and outrageous conduct was undertaken with the intent and/or knowledge that the conduct was extremely likely to inflict emotional distress on Plaintiff, and constitutes the tort of intentional infliction of emotional distress under Illinois state law.

168.   As a direct and proximate result of the above-described misconduct, Plaintiff suffered and continues to suffer extreme emotional distress.

## COUNT IX - ILLINOIS STATE LAW

## Sexual Assault and Battery

## (Defendant Watson)

169.   Each of the foregoing paragraphs is incorporated as if fully stated herein.

170.   Defendant Watson sexually and physically assaulted Plaintiff as described in the foregoing paragraphs.

171.    Defendant Watson's misconduct constitutes the torts of sexual assault and battery under Illinois state law.

172.    As a direct and proximate result of the above-described misconduct, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

## COUNT X - ILLINOIS STATE LAW

### Assault and Battery

### (Defendant Ayala)

173.    Each of the foregoing paragraphs is incorporated as if fully stated herein.

174.    Defendant Ayala physically assaulted Plaintiff by beating her and cutting her with a razor.

175.    Defendant Ayala's misconduct constitutes the torts of assault and battery under Illinois state law.

176.    As a direct and proximate result of the above-described misconduct, Plaintiff suffered damages, including but not limited to physical pain, emotional suffering, and mental anguish.

## COUNT XI - STATE LAW CLAIM

### Indemnification

### (Against Defendant Cook County)

177.    Each of the foregoing paragraphs is incorporated as if fully restated herein.

178.   Pursuant to 745 ILCS 10/9-102, Defendant Cook County is empowered and directed to pay any judgment for compensatory damages, and any associated attorneys' fees and costs, for which the Cook County Sheriff and/or its deputies, acting within the scope of his or her employment, are found liable.

179.   In a manner more fully described above, the misconduct by the individual Defendants was committed within the course and scope of their employment.

180.   In the event that a judgment for compensatory damages is entered against any of the individual Defendants, Defendant Cook County must pay the judgment as well as the associated attorneys' fees and costs.

### Prayer for Relief

WHEREFORE, Plaintiff, by and through her attorneys, Kathleen T. Zellner & Associates, P.C., requests that this Court enter judgment in her favor and against Defendants, awarding compensatory damages.  Further, because the conduct of all the individually-named CCJ Defendants was motivated by evil intent and/or involves reckless or callous indifference to Plaintiff's federally-protected rights, Plaintiff requests that this Court enter judgment awarding her punitive damages. Plaintiff further requests that this Court enter judgment awarding her punitive damages as to Defendants Watson and Ayala.  Plaintiff also seeks attorneys' fees, costs, and such other and further relief this Court deems just and appropriate.

### Jury Demand

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515
Phone:  630-955-1212
Fax:  630-955-1111
Email:  kathleen.zellner@gmail.com